**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

United States of America,

          Plaintiff,                    Case No.  1:18cr088

          v.                        Judge Michael R. Barrett

Saad Sakkal, M.D.,

          Defendant.

**ORDER**

This matter is before the Court on Defendant's Motion for Judgment of Acquittal (Docs. 61, 62 (brief)), timely filed on April 14, 2019,[1] which the United States opposes (Doc. 63). This matter is also before the Court on Defendant's Motion for a New Trial (Doc. 64), timely filed on April 19, 2019,[2] as supplemented (Docs. 75, 87), which the United States opposes (Doc. 86). An evidentiary hearing as to the Motion for a New Trial, as supplemented and specifically on the issue of ineffective assistance of counsel, was held on March 2 and 4, 2020. Post-hearing briefs were subsequently received. (*See* Docs. 91, 92, 93). For the reasons that follow, both Defendant's Motion for Judgment of Acquittal and Defendant's Motion for a New Trial will be DENIED.

**I.    BACKGROUND**

Defendant was charged with 32 counts of unlawfully dispensing or distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1). Counts 1 through 30 pertained to specific incidents of prescriptions issued to 20 different patients.

---

[1] A jury verdict was returned against Defendant on April 11, 2019. (Doc. 59). "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1).
[2] "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2).

Counts 31 and 32 ("death specification counts") pertained to specific incidents of prescriptions regarding 2 different patients, both of whom died. Defendant also was charged with 7 counts (Counts 33 through 39) of knowingly using a registration of another person, Lori Elahee-Lee, in violation of 21 U.S.C. § 843(a)(2). The jury returned a verdict of guilty on Counts 1 through 32 and Counts 33 through 38, and not guilty on Count 39. (Doc. 59).

Defendant was initially represented by retained counsel Mitchell W. Allen. (Doc. 8). On September 17, 2018, retained counsel Richard J. Goldberg entered his appearance. (Doc. 27). Mr. Goldberg represented Defendant at trial and later filed the pending Motion for Judgment of Acquittal and the original Motion for a New Trial. Mr. Allen, however, filed Defendant's Supplement to His Motion for a New Trial (Doc. 75) on June 21, 2019,[3] alleging ineffective assistance of trial counsel as to Mr. Goldberg. Thereafter, on June 25, 2019, Mr. Goldberg filed a Motion to Withdraw as Counsel (Doc. 78), which this Court granted (*see* 06/25/2019 Minute Entry and 06/26/2019 Notation Order). By agreement, the issues surrounding the scope of the waiver of the attorney-client privilege and the scope of discovery underlying the ineffective assistance claims were referred to the Magistrate Judge for review and disposition. (*See* 09/04/2019, 09/30/2019 & 10/29/2019 Minute Entries, Docs. 81–85).

As stated, an evidentiary hearing as to Defendant's Motion for a New Trial, specifically on the issue of ineffective assistance of counsel, was held on March 2 and 4, 2020.

---

[3] Mr. Allen has filed all subsequent briefs on Defendant's behalf.

## II.    MOTION FOR JUDGMENT OF ACQUITTAL

In Counts 33 through 38, Defendant was convicted of using the registration of

another person, nurse practitioner Loree Elahee-Lee, while dispensing controlled

substances via electronic prescriptions.  In support of acquittal, Defendant argues that

there was no testimony that he actually signed the prescriptions.  (Doc. 61 at PageID

420).  Further, Defendant was convicted as to the death specification in Count 2 (Count

31) yet acquitted as to the one in Count 4 (Count 32).  As to both, though, the coroner

testified that the deaths were each accidental and as a result of multiple drug toxicity.

And, save for an autopsy performed on the patient described in Count 2 (Patient 1), but

not on the patient described in Count 4 (Patient 2), the "inconsistent" verdict "makes no

sense."  (*Id.* at PageID 421).  Finally, and concerning the remaining counts, there was

insufficient evidence that Defendant prescribed the controlled substances "without a

legitimate medical purpose in the ordinary course of professional practice."  (*Id.* at

PageID 422).[4]

The United States correctly sets forth the standard of review for a motion for a

judgment of acquittal:

> The court must ask whether "*any* rational trier of fact could have
> found the essential elements of the crime beyond a reasonable
> doubt." *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979) [emphasis
> in original]; *accord United States* v. *Caseer*, 399 F.3d 828, 840
> (6th Cir. 2005). In that inquiry, the court must view all evidence
> in the light most favorable to the Government and draw all
> inferences in favor of the Government. *United States* v. *Driver*,
> 535 F.3d 424, 428–29 (6th Cir. 2008). The court "neither
> independently weighs the evidence, nor judges the credibility of
> the witnesses who testified at trial." *United States* v. *Hughes*,
> 505 F.3d 578, 592 (6th Cir. 2007) (internal quotation marks
> omitted).

---

[4] A prescription for a controlled substance "must be issued for a legitimate medical purpose by an
individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).

(Doc. 63 at PageID 429–30).  And, under this standard of review, no aspect of Defendant's Motion is well-taken.

Regarding Counts 33 through 38, the prescriptions at issue bore the signature "Saad Sakkal."  Ms. Elahee-Lee testified that she did not sign, or otherwise authorize, any of the prescriptions, yet they ended up on her OARRS report[5] rather than on Defendant's OARRS report.  She also testified that she left Lindenwald Medical Associates in May 2015, well before the prescriptions were issued in 2016.  And, at the time the prescriptions were issued, Defendant was the only provider issuing prescriptions at Lindenwald, and only a physician could enter medications into Lindenwald's EMR system in order to generate a prescription.  As for the signature match, there were numerous examples of Defendant's signature in the medical records regarding Patients 1 through 20 available for comparison, as well as a legal document signed by Defendant under penalty of perjury that was identified by Defendant's son.  Viewing this circumstantial evidence in a light most favorable to the United States, a rational jury most certainly could infer and find that Defendant signed the prescriptions.[6]

Regarding Count 2, the Court notes, preliminarily, that a sufficiency-of-the-evidence claim "should not be confused with the problems caused by inconsistent

---

[5] The Ohio Automated Rx Reporting System ("OARRS") is a prescription monitoring system.  *United States v. Temeck*, No. 1:17cr050, 2018 WL 3609503, at *1 (S.D. Ohio July 27, 2018).  When a prescription for a controlled substance is filled, the pharmacist enters information about the patient and the prescription into a database.  *Id.*  Both law enforcement and healthcare professionals have access to the database.  *Id.*  Law enforcement uses the information to prevent diversion of prescriptions for controlled substances.  *Id.*  Healthcare professionals use the information to monitor a patient's prescriptions for controlled substances.  *Id.*
[6] Defendant was acquitted on Count 39, testament that the jury carefully weighed the evidence as to each of these seven counts.

verdicts." *United States v. Powell*, 469 U.S. 57, 67 (1984).  The Supreme Court explains:

> Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt.  This review should be independent of the jury's determination that evidence on another count was insufficient.  The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilty beyond a reasonable doubt.  We do not believe that further safeguards against jury irrationality are necessary.

*Id.* (internal citations omitted).  In and of themselves, then, inconsistent verdict claims generally are held to be not reviewable.  *United States v. Stetler*, 526 F. App'x 631, 635 (6th Cir. 2013) (citing *United States v. Lawrence*, 555 F.3d 254, 262 (6th Cir. 2009)). Nonetheless, the United States argues that the verdicts on the death specifications were not inconsistent, and more critically, viewing the evidence in the light most favorable to the government, a rational jury could have convicted vis-à-vis Patient 1. The Court agrees.

Patient 1 and Patient 2 presented with different medical histories and had different comorbidities.  As Defendant points out, an autopsy was performed on Patient 1, ruling out other possible causes of death.  (*See* Doc. 70 at PageID 1077 (4-39:1–7)). No autopsy was performed on Patient 2, who had specific heart issues that could have led to a fatal heart attack, as pathologist James W. Swinehart allowed on cross-examination.  (*Id.* at PageID 1078 (4-40:4–8), 1092–93 (4-54:14–4-55:1)).  Further, the controlled substances that were charged for Patient 2 were within therapeutic limits. While she had a highly-elevated amount of Prozac in her system at the time of death (*see id.* at PageID 1090 (4-52:1–23)), there was no testimony as to the effect this might

have on her.  In contrast, the controlled substances that were charged for Patient 1 were highly elevated in her system (*see id.* at PageID 1077 (4-39:8–21)), and there was testimony that such combinations could lead to respiratory depression.

Regarding the remaining counts, defense counsel acknowledges the "overwhelming" amount of evidence "that Dr. Sakkal practiced bad medicine, specifically, with his prescribing habits."  (Doc. 61 at PageID 422).  Contrary to the defense argument that "a bad doctor does not equate to being a drug dealer" (*see id.*), the United States introduced ample evidence regarding intent.  Defendant repeatedly dismissed warnings about his behavior from multiple sources, including from Lindenwald employees and its EMR system, outside pharmacies, and the patients themselves.  In this circumstance, a jury easily could find that Defendant's prescribing habits were at odds with any "legitimate medical purpose."

## III.    MOTION FOR A NEW TRIAL

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "A violation of [a defendant's] Sixth Amendment right to effective assistance of counsel clearly meets [the interest-of-justice] standard."  *United States v. Soto*, 794 F.3d 635, 645 (6th Cir. 2015) (quoting *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010)).

The United States correctly sets forth the standard of review for ineffective assistance of counsel:

> The governing standard for ineffective assistance of counsel is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires that the assistance was "so defective as to require reversal of a conviction."  There are two components to the *Strickland* standard.  The defendant

6

> must show: (1) that counsel's performance was deficient; and (2) that the defendant was prejudiced. *Soto*, 794 F.3d at 646.
>
> An attorney's performance is deficient if it falls below an objective standard of reasonableness. *Id.* The Court must ignore hindsight and "evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

(Government's [Prehearing] Memorandum, Doc. 86 at PageID 1848–49). "Failure to make the required showing of **either** deficient performance **or** sufficient prejudice defeat the ineffectiveness claim." *Strickland*, 466 U.S. at 700 (emphasis added).

Defendant's ineffective assistance of counsel claim is two-fold. He contends that Mr. Goldberg "misunderstood" the elements of 21 U.S.C. § 841(a)(1). This misunderstanding led to him giving Defendant a false impression of an assured acquittal and thus an inability to rationally consider a plea offer. Further, Mr. Goldberg's misunderstanding in turn informed an unsuccessful trial strategy, which included decisions to not present expert testimony and to advise against Defendant testifying. Defendant contends also that Mr. Goldberg failed to inform him, until the morning of trial on April 1, 2019, about the tender of a plea offer from the United States on March 20, 2019. Moreover, when given the opportunity to discuss the offer the day of trial, Mr. Goldberg failed to tell Defendant whether he should accept it.

Five witnesses testified at the two-day evidentiary hearing: Mr. Goldberg; Defendant; and Defendant's son, daughter, and son-in-law. The Court will review and break down the testimony—largely emphasizing Mr. Goldberg's—as it relates to these areas of inquiry.

7

**A. Trial Strategy**

**1. Theory of the Case**

On October 22, 2018, approximately one month after he was retained, Mr.

Goldberg wrote Defendant a multi-page letter. (Defendant's Exh. 7). He noted that

"acquittal on all of the charges" was "the number one goal" and outlined two theories of

the case. (*Id.* at 1). He bluntly observed, "The expert for the government will give his

opinion that you acted outside the scope of a medical practice and not for legitimate

medical purposes." (*Id.*). With this in mind, along with various cross-examination

liabilities, Mr. Goldberg recommended "conced[ing] everything the government is

saying, including their expert." (*Id.* at 3). "The real question is whether you acted with a

**legitimate medical** purpose. This is where we need to focus." (*Id.* (emphasis in

original)). He continued:

> There are no guidelines anywhere for the definition of a legitimate
> medical purpose in the course of professional practice. You were
> within the legitimate medical purpose, thus you never had any
> criminal intent whatsoever. Your only intent was to help your
> patients get better. If the government wants to disagree with your
> protocols and your methods, then so be it. The bottom line is you
> acted in good faith and what you believe to be the best interest of
> every single one of your patients. **To be found guilty, a jury must
> find beyond a reasonable doubt that you acted as a drug
> dealer and not a medical professional.** I do not believe a jury will
> find you acted as a drug dealer, notwithstanding all of the above
> factors that may just look bad.

(*Id.* (emphasis added)).

The "drug dealer and not a medical professional" reference underpins

Defendant's argument that Mr. Goldberg did not understand the elements of 28 U.S.C.

§ 841(a)(1) and, as a consequence, crafted a strategy contrary to *United States v.*

*Volkman*, 797 F.3d 377 (6th Cir. 2015). In *Volkman*, a doctor was tried and convicted

8

under the Controlled Substances Act. The district court rejected this defense-proposed

instruction: "In other words, in order to find the defendant guilty, you must find that he

used his prescription-writing power as a means to engage in the illicit drug-dealing and

trafficking as conventionally understood." *Id.* at 385. The Sixth Circuit agreed, finding it

to be too narrow:

> **In the past, we have endorsed a broad approach to**
> **determining what conduct falls outside the accepted bounds**
> **of professional practice so as to constitute a [Controlled**
> **Substances Act] violation, eschewing a preestablished list of**
> **prohibited acts in favor of a case-by-case approach.** *See*
> *United States v. Kirk*, 584 F.2d 773, 784 (6th Cir. 1978). Simply
> put, Volkman's proposed instruction would have needlessly
> narrowed the scope of the jury's inquiry to a question of whether
> Volkman engaged in 'conventional' drug dealing and trafficking by
> using his prescription power. By narrowing the scope of the jury's
> deliberation in such a manner, Volkman's instruction would have
> been inconsistent with our endorsement of the broad approach,
> improperly cabining a decision that is properly left to the jury.

*Id.* at 386 (emphasis added). But relevant to Defendant's contention here, the Sixth

Circuit approved as a whole the jury instructions given, which included:

> It's the theory of the defense that the Doctor Volkman, Doctor Paul
> H. Volkman, treated his patients in **good faith**. If a physician
> dispenses a drug in **good faith** in the course of medically treating a
> patient, then the doctor has dispensed the drug for a **legitimate**
> **medical purpose in the usual course of accepted medical**
> **practice**. That is, he has dispensed the drug lawfully.
>
> "**Good faith**" in this context means **good intentions** and **an**
> **honest exercise of professional judgment** as to a patient's
> medical needs. It means that the defendant acted in accordance
> with what he reasonably believed to be proper medical practice.
>
> In considering whether the defendant acted with **a legitimate**
> **medical purpose in the course of usual professional practice**,
> you should consider all of the defendant's actions and the
> circumstances surrounding them.

*Id.* at 387 (emphasis added).

A comprehensive review of Mr. Goldberg's file confirms that he researched, understood, and applied the correct legal standard in preparing Defendant's defense.[7] And he communicated this standard to his client on multiple occasions. For instance, his letter to Defendant dated November 1, 2018, stating that "there are no standardized written codes or regulations that define proper medical practice" (Defendant's Exh. 8), is consistent with the instruction given in *Volkman*. 797 F.3d at 387 ("In making medical judgments concerning the appropriate treatment for an individual, however, physicians have discretion to choose among a wide range of available options."). So, too, are the statements made in his letter to Defendant dated January 4, 2019 (Defendant's Exh. 12), that "[t]he theme we must get across is that, in good faith, you used your best professional medical judgment" (at page 1) and "[t]he key language is whether you acted with a **legitimate medical purpose**" (at page 2 (emphasis original)). Indeed, Defendant testified at the hearing that he discussed the "legitimate medical purpose" standard with Mr. Goldberg a "number" of times.

The Court sees no evidence of "misunderstanding" or "misinformation" that would have left a "false impression in the mind of Dr. Sakkal regarding his realistic chances at trial and whether or not plea offers were reasonable under the circumstances" (*see* Doc. 87 at PageID 1855). To say that Mr. Goldberg told Defendant that the government would have to prove he acted as a "drug dealer" in order to convict is a mischaracterization of his message as a whole. Mr. Goldberg repeatedly touted a "good faith" defense, one that would need to be tailored around a government expert

---

[7] The jury instructions Mr. Goldberg proposed on Defendant's behalf were in accord with those approved in *Volkman*. (*See* Doc. 42). That he argued for additional instructions that folded in a "drug dealer" concept (*see id.* at PageID 220–21) is an indication of zealous representation, not ineffective assistance.

that would opine that Defendant's prescription practices were at odds with a legitimate medical purpose.  As will be explained in more detail, *infra*, the need to incorporate a "naïve prescriber" theory surfaced after Mr. Goldberg's meetings with Dr. Akbik, who concurred with the government expert and advised that a competing expert approach would be impossible.  Although he did not identify Dr. Akbik to his client by name, Mr. Goldberg told Defendant that he had consulted with an expert, in fact more than one, and that this weakness in his case would need to be addressed.  Notably, Defendant's son-in-law, also a medical doctor, was present during Mr. Goldberg's first meeting with Dr. Akbik and thus aware of both his identity and opinion.

## 2. **Expert Testimony**

Early in the case, in terms of overall strategy, in Mr. Goldberg's view several options were on the table:

> Q. Exhibit Number 4, this is also dated September 25th. Can you tell us what that is?
> A. Oh, okay. This is -- again my own thinking, this is a memorialization of what I was thinking, that there were **three different ways to defend** the case.
> One would be more or less to **find a competing expert** to the government's expert to refute what the government and their expert was saying.
> The second way would be to not use an expert and to defend the case with a different theory, and that theory was Dr. Sakkal may have committed civil wrongs, malpractice for example, but that he didn't commit a crime, **defending the case without an expert, conceding some of the inappropriate medication, his prescribing practices, and defending that they could not prove criminal intent more or less**.
> The third way would be to **work out a plea.**

(Doc. 90 at PageID 1884–85 (9:19–10:9) (emphasis added)).  Ultimately, after interviews and research, Mr. Goldberg concluded that it would be tactically unwise to present a defense expert:

Q. . . . And on September 17th, 2018, does that letter [Defendant's Exh. 2] accurately reflect what you intended to do, namely get expert witnesses to review and rebut the opinions from the government's expert?

A. That was my initial thoughts at that time, correct.

. . . .

Q. Is that note [Defendant's Exh. 3] a true and accurate copy of your note from your meeting with a Dr. Akbik apparently on [September] 24th?

. . . .

**Q. Dr. Akbik "has an excellent understanding of the issues, both medical and legal"?**

**. . . .**

**Q. And that he told you that Dr. Sakkal cannot win for multiple reasons?**

**A. Yes.**

Q. All right. He went through some of those reasons. Inconsistent urine testing, almost entire nonexistent. He had a habit of putting the patients on opiates. Double and triple combination of drugs were not appropriate. The opiates and depressants were not indicated for mental health patients and there were many of them. When the pharmacy stopped filling prescriptions, that was a real bad sign. And then as we go on down, "He believes that Dr. Sakkal did not check OARRS for doctor shopping," correct?

A. Correct.

. . . .

Q. "No objective testing or diagnostic testing done"?

. . . .

Q. "No weaning of patients"?

. . . .

Q. He also looked at the two death cases, and he said that Dr. Sakkal was in trouble on them because the levels were extremely high?

A. The toxicology level, yes.

Q. And he indicated that he thought Dr. Sakkal had a good heart and wanted to help his patients, but he should not have been prescribing them the drugs and drugs combinations that he was doing because he was endangering them
by not following any of the protocols?

A. Any of the appropriate protocols, yes.

Q. And that "he went outside the proper standards of medical care"?

A. Right.

Q. All right. And does that accurately summarize what Dr. Akbik told you?

. . . .

12

THE WITNESS: These are notes to myself that I dictated pretty contemporaneously with the occurrences. Did I give them paper-wise to my client? No, but I discussed them with my client, for the most part.

. . . .

Q. And who was with you when you met with Dr. Akbik on September 24, whatever day it was?

A. Dr. Sheatt, who is Dr. Sakkal's son-in-law, was with me. The first meeting, I think it was just me, him and Dr. Akbik. There was a later meeting too with somebody else present, but I believe the first meeting was with me, Dr. Sheatt, and Dr. Akbik.

. . . .

Q. And then [Defendant's] Exhibit 7, is this a letter you dictated to Dr. Sakkal or sent to Dr. Sakkal on October 22nd, 2018?

A. Yes.

Q. All right. And in this letter you're telling him that you are thinking that there is a better approach to defending this case than going head to head with the experts, correct?

A. I told him that in the letter and also verbally from time to time, yes.

. . . .

Q. All right. You indicate in the third paragraph, the large paragraph at the bottom, "The expert for the government will give his opinion that you acted outside the scope of medical practice and not for legitimate medical purposes."

A. I'm looking for that.

. . . .

Q. Okay. And you said that going up directly against their expert, frankly you don't find this to be a successful defense, it's not worked in the other many cases that have taken place throughout the United States.

A. Yes. By that time I believed it would not be the best way to defend the case.

. . . .

**Q. . . . Were you aware on November 1st that Dr. King would opine as he does on page 2 that "Review of the clinical record demonstrates the use of controlled substances outside the usual course of medical practice. Failing to practice within the standard of care for the use of opiates in the treatment of chronic pain, Dr. Sakkal prescribes controlled substances without a legitimate medical purpose"?**

**A. I was aware of that well in advance of the trial that that was his opinion.**

**Q. And you knew that he would testify to such a thing?**

**A. Yes, I did, and so did Dr. Sakkal. Dr. Sakkal had Dr. King's report.**

13

. . . .

A. . . . He and I both thought from the outset, we both believed that we have to get experts to rebut what the government and their expert was saying. Along the way, it came to my belief that that's not the best way to defend the case. So I discussed that many times with Dr. Sakkal. I wanted him and his family to understand why I felt going head to head, expert versus expert is not the best way, and he said/she said-type case.

. . . .

And he came around and ultimately agreed with me.

. . . .

Q. Now, you would agree, would you not, that you did not tell Dr. Sakkal at any point that you had met with Dr. Akbik?

A. I told him I have talked to an expert.

Q. Okay. You did tell him that you had talked to an expert?

A. I told him I talked to a pain management expert.

Q. And did you tell him what that pain management expert said?

A. Yes.

**Q. Okay. What did you tell him that pain management expert said?**

**A. I told him that this person looked at charts, particularly the death cases, and that the toxicology reports were damaging to our case. Again, I think it's set forth in one of my letters that you went over. The experts said that the urine testing was inconsistent and sporadic, OARRS were not checked, these are dangerous combinations of drugs prescribed together, that Dr. Sakkal was not a pain doctor, he wasn't board certified in pain management –**

**He had several board certifications, but not pain management.**

**-- and that, in his opinion, there would not be an expert that would be able to testify for us.**

**I had reached that decision independently from what the expert said. It was kind of my confirmation what I was thinking about all along, "I'm not sure if I can find an expert." I did some research. I looked for experts.**

**. . . .**

**I did share all the opinions I received from Dr. Akbik with Dr. Sakkal, and I think I set them forth in that letter.**

. . . .

Q. . . . First, paragraph number 1 [Government's Exh. E], you mentioned that you were convinced your trial strategy was the best available given the facts?

A. Yes.

Q. All right. Does that refer in part to the idea of not hiring a separate expert?

A. That's exactly what it refers to.

Q. And, instead, was it your strategy to focus on good faith and intent?

A. Yes.

Q. Okay. You also mentioned in there that you met with a pain specialist expert personally two times. Is that Dr. Akbik?

A. Yes.

Q. All right. And he concurred in your evaluation?

A. Yes.

Q. And you said that just corroborated what your independent research had?

A. It was my thinking before the first meeting that this is the way we ought to go and not go head to head and he said/she said with the government's expert. And after meeting with him, he confirmed and he believed that was the best defense as well.

**Q. Paragraph 3 [Government's Exh. E], you mentioned that you consulted personally with a former worker from the state medical board. Who was that?**

**A. I think his name was Michael Staples. His last name was Staples. I think his first name was Michael. He was at the second meeting when I went to meet Dr. Akbik. He was present.**

**. . . .**

**A. Having been a former employee of a state medical board, he seemed to be familiar with these type of cases. Within that discussion we had, he was -- he felt the same way as I did and as Dr. Akbik, that the best defense would be that Dr. Sakkal was not a pain doctor, he was in over his head, he had good intentions, and he acted in good faith, and he made mistakes but that he didn't have criminal intent.**

**. . . .**

**Q. You mentioned that you had looked for other possible experts as well?**

**A. Yes.**

**Q. All right. If you flip back, there is a profile for a Dr. Adam Carinci from Rochester?**

**A. That sounds familiar. I think I have that in my file.**

**. . . .**

Q. All right. And then if you go to the very last page of that exhibit, there is a handwritten note. Is that your handwriting?

A. That's my handwriting, and I think those are two potential experts that I thought about calling to testify.

Q. Okay. So it was something you considered?

A. Absolutely.

Q. And researched?

A. Yes.

15

. . . .

**Q. All right. So overall when you made your decision regarding
the experts, was that based in part on your research of other
cases?**

**A. In part, yes.**

**Q. Okay. Did you also speak with other defense counsel who
had handled cases like this?**

**A. I did.**

**Q. Who?**

**A. I talked to Candace Crouse, now Judge Crouse, who was
one of the attorneys on the *Volkman* case.**

. . . .

Q. And all of this was part of what you factored into your strategy,
your overall strategic decision?

A. That was factored in, yes.

Q. Were your conversations with Mr. Staples also a part of that?

A. Yes.

. . . .

A. And, you know, there were even some other factors. I had an
investigator helping me with this case, Brenda Beyersdoerfer, and
she met with me and Dr. Sakkal. She was present at least on one
or two other visits. I discussed with her, and she felt -- as a lay
person, she felt that was a proper strategy. And I also -- I think I've
kicked it around with a couple of other lawyers, and I can't even
recall who, just in general terms.

So there was a lot that went into my thinking about what the
best strategy would be in this case.

Q. All right. Let's turn to page 10 of [Government's] Exhibit A. This is a
note that you dictated around October 2, 2018?

. . . .

A. "I think the family agrees with me that the best defense
is not to get an expert, but to defend on whether he had
criminal intent." That was October of 2018.

Q. And is that something you went back and forth with Dr. Sakkal
about.

A. We talked about that many times, yes.

**Q. And if Dr. Sakkal did not agree with that strategy, [he] could
have insisted that you hire an expert?**

**A. At first he didn't agree with it, but the more I discussed it
with him, the more he came around to understand that would
be the best way.  He did agree.**

(*Id.* at PageID 1881 (6:21-25); 1882–84 (7:2-3, 10-12, 19-25–8:6, 9, 11, 13-25–9:2,

12-15); 1886 (11:3-9); 1887–88 (12:6-13, 19-23), (13:1-6); 1891 (16:12-23);

1894 (19:9-16, 19-20); 1907–08 (32:17–33:17, 20-21); 1918–20 (43:17–44:20, 22-25–45:3, 8-13, 16-24); 1926 (51:14-23); 1927–29 (52:18-23, 25–53:11, 18-20), (54:1-3) (emphasis added)).

Under *Strickland*, "trial counsel's tactical decisions are particularly difficult to attack." *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690; *see Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001).

Mr. Goldberg testified at length as to why he thought the use of an expert at trial to be ill-advised. The very first expert with whom he consulted pretrial, Dr. Akbik, was resoundingly critical of Defendant's prescription practices. Significantly, Dr. Akbik, with a background in anesthesiology and pain management, had previously worked with the United States in "pill mill" cases and, therefore, understood the issues to be tried. And, ironically, he was one of the experts that Defendant himself suggested. Mr. Goldberg's decision, having consulted Dr. Akbik and others informed in the regulatory and criminal process, including former trial counsel from the *Volkman* case, plainly was based on a "substantial investigation into the possible defenses[.]" *Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984). Because Mr. Goldberg conducted a reasonable examination, Defendant was not denied effective assistance of counsel as to the issue of expert testimony. *See United States v. Stegawski*, 687 F. App'x 509, 513 (6th Cir. 2017) (trial counsel reasonably decided not to retain medical expert because no one would have supported defendant doctor's "prescription habits").

Further, ineffective assistance claims based on the failure to hire an expert must be rejected when the defendant cannot show, with reasonable probability, that "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  For example, in *Stegawski*, the Sixth Circuit noted that "any chance of establishing prejudice from this trial strategy was vanishingly slim" considering the damaging testimony of an undercover officer and clinic patients and employees.  687 F. App'x at 513.  Here, as the United States points out, similar damaging testimony was adduced with regard to Patient 1:  Defendant's own medical records note that a caller had advised that the victim was abusing her medications and that, during an office visit, she was under-the-influence and slurring her words.  Moreover, Defendant does nothing more than speculate that the outcome would have been different if an expert had testified on his behalf at trial.  Under *Strickland*, however, "the likelihood of a different result must be substantial, **not just conceivable**." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (emphasis added) (citing *Strickland*, 466 U.S. at 693)); *Maze v. Lester*, 564 F. App'x 172, 182 (6th Cir. 2014).

### 3. Defendant's Testimony

While Mr. Goldberg's initial thought was to have Defendant testify in his own defense, this opinion diminished over time:

> Q. And then on the last page, page 4 [of Defendant's Exh. 7], the sentence of the first paragraph, you said, "I think with the right preparation you will make an outstanding and convincing witness in your defense."
> A. That's what I felt at the time, yes.
> Q. All right. **That apparently changed at some point; is that correct?**
> **A. It changed much later on. In fact, my hope was that he would testify during the trial, all the way up until probably the time of trial.**

. . . .

Q. All right. Now [Defendant's] Exhibit 10, this is a letter from Dr. Sakkal to you. Do you recall receiving this letter?

A. I received numerous letters from Dr. Sakkal. So if this came out of my file, then I received it.

. . . .

Q. Do you recall receiving this letter [Defendant's Exh. 11] from Dr. Sakkal?

A. Well, not specifically, but if it was in my file, I received it and read it, yes.

Q. . . . [Defendant's] Exhibit 12, was this a letter that you sent to Dr. Sakkal on January 4th, 2019, talking about how he should feel about preparing himself and how he should conduct himself as a witness in the case?

. . . .

**Q. As of January 4, 2019, would it be fair to say as of that date you were still intending to call Dr. Sakkal as a witness?**
**A. Yes.**

**. . . .**

**Q. Had you made a decision that you were not going to call Dr. Sakkal as a witness at that point?**
**A. It wasn't my decision. I probably at this point was -- during the trial, if this note came during the trial, which it did, my feeling was recommending to him strongly that he should not testify.**

. . . .

Q. [Defendant's] Exhibit 19. Did you receive this note from Dr. Sakkal during the trial?

A. I believe so, yes.

. . . .

Q. [Defendant's] Exhibit 20. Have you seen this note?

A. Yes.

Q. All right. Dr. Sakkal is asking, "Any chance I would testify?"

A. Yes.

Q. And then he says, "Any change of mind after today," and he puts an emphatic box around the "after today"?

A. Yes.  I remember receiving this note, yes.

Q. This is presumably after [the United States' expert] Dr. King testified?

A. Probably, but I can't be certain.

Q. All right.  **And do you recall responding to him "Over my dead body"?**

**A. Probably, yes.  I was very emphatic that I didn't think he should, in my opinion.**

Q. All right.

**A. And then I said that in jest, obviously.**

19

**Q. All right. Well, yeah.**
**A. I just wanted to emphasize I didn't think he should testify.**
Q. It's a figure of speech. We're certainly not alleging that you were going to physically harm Dr. Sakkal.
 . . . .
Q. . . . I think the judge gave a theory of the defense statement, instruction, that says, you know, the doctor, the theory of the defense is that the doctor acted in good faith in prescribing these medications.
A. Yes, at my request, yes.
Q. Okay. And wouldn't it have been useful to have put the doctor on the stand, if he felt that strongly, to explain why?
A. You know, in my practice I always prefer to put my client on the stand. In this case, it was my intent to put him on the stand. Yes, I believe he could have helped himself to a small extent.

I think, based upon what happened shortly before the trial and during the trial, he would have caused much more harm than good if he testified. And that was my opinion. I can tell you why I believe that way, if you want, but that was my opinion. He would have caused -- he would have helped a
little bit, and hurt --
. . . .

THE COURT: . . . **You indicated your recommendation was that he not testify. Could you just state what the basis for that recommendation was?**

THE WITNESS: Yes. **There were many things that Dr. Sakkal told me as fact that were not fact.**

For example**, I talked about him saying he never initially prescribed opiates on a first office visit. That's not true. The records don't bear that out. The records conflict with that.**

**Another example is "I never prescribed methadone on the first visit." Well, he had 240 doses to one patient on the first visit.**

**He said to me the pharmacists cut him off, his prescription writing, 100 percent.**

And there was a letter from the **State Board of Pharmacy**, or there was a document, an exhibit, that said **no, only his controlled substance prescribing was cut off** by the pharmacist, not his entire.

So he could have still prescribed, but he insisted that they ran him out of business because they said, "you can't prescribe any prescription drugs." That wasn't true.

I mean, and those are the ones that come to the forefront of my mind. There were many things he said that just were not true.

. . . .

**A. . . . Like I said, he could have added a tiny bit, but he would have hurt himself, in my opinion, a lot more.**

Just looking at exhibit -- just to refresh my recollection, Defense Exhibit 7, you know, I said "The government can make you look bad for several reasons," and he would have been pounded on every one of these.

. . . .

A.  The combinations -- **there were many calls from pharmacies. He picketed pharmacies and wanted his patients to picket pharmacies with him**.

He told me another example.  These keep popping in my mind.  **"I'll have patients come in and tell the Court that I helped them, I did great."  I couldn't get one patient to come in and testify for him.**  He wanted to run an ad in the newspaper calling patients to come in and testify for him.  I said that that would be a horrible idea.

I mean, his thinking along these lines was just, was just, it would have killed him on cross-examination.  **There were no OARRS.  You know, all the things he should have been doing he wasn't doing.  He would have been caught on cross-examination terribly, terribly.**

Patients were coming in demanding prescriptions by their street names.  "I want Xanny bars" instead of "Xanax".  I mean, that should be the first clue that this patient should not be given benzodiazepine if they're coming in asking for them by their street names.

I had enough trouble rebutting these things without him testifying, without him getting on the stand and then make him look a hundred times worse because he was going to answer that he thought it was okay that someone would come in asking for Xanny bars?  That's just an example, as I recall.

**It would have hurt him a lot more.  Like I said, any chance that we had of success would have withered away from some percentage of success down to zero if he testified.  That was my considered opinion.**

I've tried hundreds of cases in my career, hundreds of juries, federal and state court, and that's just my opinion based upon my education, experience, and practice doing criminal law for 45 years.

(Doc. 90 at PageID 1889 (14:10-19); 1892–93 (17:16-19, 22-25–18:3, 8-10);

1898–99 (23:2-7, 8-10, 18-25–24:13); 1914 (39:9-25); 1953–54 (78:8–79-6); 1956 (9-

14); 1957–58 (82:2–83:8) (emphasis added)).

21

It is patently clear that Mr. Goldberg, based upon his interaction with his client and damaging information available to the United States on cross-examination, made a tactical decision to recommend against Defendant's testimony. Under the circumstances described, this decision was a reasonable one, not subject to challenge under *Strickland*.[8] Defendant's speculation that his testimony might have persuaded one juror and led to a hung jury, a "win" in his estimation (*see* Doc. 91 at PageID 1965), does not dictate a different result. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight[.]" *Strickland*, 466 U.S. at 689.

### 4. Cross-Examination of the Government's Expert

Timothy E. King, M.D. testified as an expert for the United States. He concludes his three-page written report (dated June 3, 2017) with this summary:

> In summary, Dr[.] Sakkal's use of controlled substances is outside the standard of care. He fails to establish objective and legitimate diagnoses generally considered acceptable for use of chronic opioid therapy. In addition to unsupported medical diagnoses, Sakkal fails to properly assess serious mental health and co-morbid risk factors – thus contributing to ongoing drug dependency,

---

[8] The right to testify on one's own behalf at a criminal trial is well-established. *See Rock v. Arkansas*, 483 U.S. 44, 50 (1987). As the Court understands Defendant's argument, he does not claim that Mr. Goldberg failed to *permit* him to testify. Rather, Defendant raises a failure to *call* him to testify, which serves as one of several components to his claim of ineffective assistance. *See Varney v. Booker*, 506 F. App'x 362, 367–68 (6th Cir. 2012).

In this regard, Mr. Goldberg testified on cross-examination that, while he forcefully recommended against it, the decision as to whether Defendant would testify "wasn't my decision." Remarkably, despite a lengthy cross-examination and re-cross, Mr. Goldberg was *not* asked by Mr. Allen the straightforward question of whether he advised Defendant that it was his decision, alone, as to whether to testify in his own defense. But counsel for the United States did ask—"Q. Did you make it clear that it was his option?" A. "Absolutely. I was strong with him and said, 'I don't think you should testify. I don't want you to testify.'" (Doc. 90 at PageID 1936 (61:2-4)).

For his part, Defendant testified that Mr. Goldberg's use of the figure of speech "over my dead body" was "a strong position" he was unwilling to "cross". "A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel." *United States v. Webber*, 208 F.2d 545, 551 (6th Cir. 2000). "When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct." *Id.* At no time during trial did Defendant alert the Court of any disagreement between himself and Mr. Goldberg.

addiction, and diversion.  Treatment plans are opiate-centric, ineffective, and dangerously formulated.  Targeted and objective treatment goals are not established.  Improvement in function, quality of life, and pain scores are not demonstrated.  Disability, worsening function, and unemployment are usual outcomes.  In 7 out of 27 medical records, death is observed.  Inconsistent urine drug screens (UDS's), doctor shopping, pharmacy shopping, and aberrant opioid behaviors are not enforced.  Controlled substances are issued despite failures of treatment, bad outcomes, and ongoing indications of addiction and dependency.

Sakkal's use of controlled substances is not supported by generally accepted scientific and medical principles of pain care.  Controlled substances are prescribed without a legitimate medical purpose and outside the usual course of medical care.

(Defendant's Exh. 30).

In support of his Motion, Defendant focuses on this excerpt from Dr. King's

report:

Although Sakkal's doses of prescribed opiates are generally less than 50 MEQ[9], there are multiple instances where dangerous and addictive drugs are prescribed in combination:

 . . . .

* *Methadone/benzodiazepine*:  a deadly combination associated with over-sedation, respiratory depression, and death.

(*Id.*).  He is critical of Mr. Goldberg's failure to not cross-examine Dr. King with the

information found in two United States Food and Drug Administration (FDA) Drug Safety

Communications, one dated August 31, 2016 (pre-dating King report) (Defendant's

Exh. 28) and the other September 20, 2017 (post-dating King report) (Defendant's

Exh. 29).  Defendant's son testified that he gave these documents to Mr. Goldberg,

although they obviously are publicly accessible.  The August 31, 2016 Safety

Announcement refers to the "growing combined use" of "opioid medicines with

benzodiazepines or other drugs that depress the central nervous system (CNS),"

---

[9] Dr. King testified that MEQ refers to "morphine equivalent".  (*See* Doc. 73 at PageId 1581 (233:7-8)).

presumably suggesting that this prescription practice was in fact within the "usual course of care." (*See* Defendant's Exh. 28 at 1).[10] The September 20, 2017 Safety Announcement advises that "methadone should not be withheld from patients taking benzodiazepines" because "the harm caused by untreated opioid addiction can outweigh the[ ] risks" of serious side effects. (Defendant's Exh. 29 at 1).

The Court observes that Dr. King's discussion of the "dangerous and addictive drugs [Defendant] prescribed in combination" included more than methadone and benzodiazepine. (Defendant's Exh. 30 at 3). They also included three other categories: the "holy trinity" (opiate, benzodiazepine, Soma), a "prescriptive speedball" (opiate, stimulant), and the "triple threat surprise" (methadone, benzodiazepine, stimulant). (*Id.*). Thus, cross-examination that might undercut one category does little to undercut the other three. Regardless, the exact manner and means of cross-examining a witness are left to the discretion of trial counsel, falling under the umbrella of strategy not subject to challenge.[11]

---

[10] The Court questions this premise, noting that the announcement cautions that the combination should be prescribed "only to patients for whom alternative treatment options are inadequate" and, if prescribed together, "limit the dosages and duration of each drug to the minimum possible while achieving the desired clinical effect." (*See* Defendant's Exh. 28 at 1).

[11] The United States calls attention to Mr. Goldberg's extensive and detailed notes made in preparation for cross-examination of Dr. King. (Government's Exh. C). Of course, the Court was present for this vigorous cross-examination, which drew out these points in Defendant's favor: Dr. King's status as a well-paid, "professional" witness for the government; the 20 (out of a pool of 4,000) patient charts were "cherry-picked" by the state Board of Pharmacy rather than selected at random; the patient charts contained a "history of present illness" and confirmed a medical examination, suggesting a "bona fide" doctor-patient relationship; all drugs prescribed by Defendant were "legal"; the Drug Enforcement Administration had the power to immediately suspend Defendant's license to write for controlled substances (yet did not); addiction is a disease that needs to be treated, and methadone has been "legally okayed" as one component of treatment; addicts unwilling to rehabilitate will turn to the street to get drugs, which could be laced with deadly fentanyl; Defendant (properly) referred one of the 20 patients to a pain clinic; Patient 1, whose death was listed as accidental and not as homicide, did not take her medication as prescribed; Patient 2, whose death was listed as accidental and not as suicide or homicide, did not take her fluoxetine as prescribed and had heart issues, high cholesterol and was morbidly obese; medicine is not an "exact science"; receiving cash for prescriptions (which Defendant did not) is a "red flag" for a "pill mill"; and there is a place in the practice of medicine for the prescription of opiates and benzodiazepines.

24

**5. Failure to Introduce Defendant's Tax Returns and Lindenwald Graphs**

Defendant complains that Mr. Goldberg failed to introduce his 2015 and 2016 federal income tax returns as "good faith" evidence that he did not profit from his prescription practices at Lindenwald. Among other above-the-line entries, the 2015 return shows that Defendant and his wife (filing jointly) had $43,602.00 of business income and $1,251,392.00 of net operating loss, resulting in an adjusted gross income of -$1,203,586.00. (*See* Defendant's Exh. 31). The 2016 return shows W-2 wages of $42,306.00, a business income loss of $50,038.00, and a decreased net operating loss of $1,219,538.00, resulting in an adjusted gross income of -$1,230,570.00. (*See* Defendant's Exh. 32). No schedules accompanied either return.

Unless admitted by stipulation, these returns would have had to be introduced through Defendant, whom Mr. Goldberg strongly believed should not testify, Mrs. Sakkal, who presumably did not earn any income based on her occupation as "Housewife," or the tax preparer. In its post-hearing brief, the United States maintains— without real challenge from Defendant—that the returns would have been "easily minimized" during cross examination because the losses were attributable to Defendant's "side" business in Mason and not his income as a contractor at Lindenwald. (Doc. 92 at PageID 1983). Moreover, Defendant hoped to purchase the Lindenwald practice, and thus "was motivated to see the practice succeed financially." (*Id.*).

"The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Viola*, No. 1:08CR506, 2011 WL 6749643, at *10 (N.D. Ohio Dec. 22, 2011) (quoting *United States v. Messina*, 131 F.3d

25

36, 41 (2d Cir. 1997)). Mr. Goldberg conceded that whether Defendant profited from his medical practice at Lindenwald was an issue, but not a "major" one. (Doc. 90 at PageID 1906 (31:9-25)). In light of his witness pool and the cross-examination risk, his tactical decision to not introduce the returns does not support a claim for ineffective assistance of counsel.

Nor does his decision to not introduce the graphs and bar charts prepared by Defendant's brother in consultation with Defendant.

Mr. Goldberg's notes (dated October 24, 2018) reflect a conversation with Defendant in which Defendant explained that the ratio of controlled substances prescriptions to total prescriptions was 15% was he started at Lindenwald, but, six months later, had reduced to 7%. (*See* Government's Exh. 12 at 1). Defendant also explained that the average "dose" of controlled prescriptions was decreased by 50%-70%, presumably in that same time period. (*See id.*). Defendant's brother later created a series of graphs and bar charts, which, in a letter dated March 23, 2019, he claimed:

- shows how Dr. Sakkal's prescriptions of controlled substance medications were reduced and non-controlled substance medications were increased in proportion to the total number of prescriptions in his practice with Lindenwald;

- shows how Dr. Sakkal's [controlled substance] medication doses are substantially lower than recommended upper therapeutic doses (7.6%-52.5%);

- shows how Dr. Sakkal's [controlled substance] medication doses are substantially lower than recommended upper therapeutic doses, and even the highest doses he prescribed are almost always significantly lower as well;

- shows how Dr. Sakkal's [controlled substance] medication doses are substantially lower than the recommended upper therapeutic doses in all cases, but it is especially critical in the first two patients with mortality attributed to these medications

> where the doses are clearly quite small and could not cause
> death; and

- shows how Dr. Sakkal's initial [controlled substance] medication
  doses are substantially lower than doses given the same
  patients by other MDs in previous treatments, and how Dr.
  Sakkal's highest [controlled substance] medication doses are
  lower than doses given the same patients by other MDs in later
  treatments.

(Doc. 27 at 1, 2).

Mr. Goldberg testified that he received these "potential" exhibits prior to trial but did not use them.  (Doc. 90 at PageID 1902 (27:3-16)).  He explained, "These charts came literally days before trial, these final charts, and they were way out of the ability to enter them as exhibits because of discovery violations.  Dr. Sakkal would not want his trial continued, and I had no time to investigate these final charts that are coming in literally days before the trial.  So I don't know.  And I don't know about even the accuracy of these charts.  They were done by somebody in his family."  (Id. at PageID 1942–43 (68:22–63:4)).  Defendant makes much of the fact that Mr. Goldberg may have seen prior versions of these charts before the eve of trial—two months before according to Defendant's testimony at the hearing—and implies that a discovery violation under Fed. R. Civ. P. 16(b) could have been avoided.  But this argument sidesteps the fundamental principle already discussed.  Introduction of these graphs and charts seemingly would have required Defendant's testimony, which, in the end, Mr. Goldberg determined was tactically ill-advised.  It is true that, at the hearing, Defendant went through these graphs and bar charts "in detail, [and] discussed his protocols for prescribing the medications, his reasoning and intentions with respect to the treatment, and the subjective and objective findings that supported his treatment."  (Doc. 912 at

PageID 1966).  But as the United States correctly points out, the errors contained within the charts would have been exposed during cross-examination.

## B. Plea Discussions

"[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."  *Missouri v. Frye*, 566 U.S. 134, 145 (2012).  "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel."  *Id.* at 147.

On March 20, 2019, eleven days before the start of trial, Assistant United States Attorney Timothy S. Mangan emailed Mr. Goldberg with a proposed plea:

1. The defendant would plead to Count 2 related to Patient 1.  The section 841 charge carries a statutory sentencing range of 0-20 years.  The government would dismiss all other charges.

2. For purposes of related conduct and the drug quantities under the guidelines, the parties would agree that the total drug quantities would be only the prescriptions set forth in Counts 1-30.  We have not calculated what the guideline range would ultimately be for those prescriptions.

3. The government would not pursue any sentencing enhancement related to the deaths as alleged in Counts 31 and 32.

4. The defendant and the government would be free to ask for or recommend any sentence.

5. The defendant would agree to forfeit his medical license.

(Defendant's Exh. 15).  Mr. Mangan followed-up the next day, relaying an estimate of the Guideline range:  a final Criminal Offense level of 23, resulting in a recommended

sentence in the range of 46-57 months.  (Defendant's Exh. 16).  On March 23, 2019,

Mr. Goldberg responded to Mr. Mangan, saying "At this point it[']s extremely doubtful

that my client will accept your plea proposal."  (Defendant's Exh. 17).

Mr. Goldberg was asked about these emails during the hearing, as well as when

he first discussed the plea offer with Defendant.

> Q. I turn your attention to [Defendant's] Exhibit 15. Is this an e-mail
> that you received from Mr. Mangan in this case?
> A. It is.
> Q. All right. And this is an offer of a plea in this case?
> A. It is.
> Q. All right. And that's dated March 20th, 2019?
> A. Correct.
> Q. That would be 11 days before the trial began?
> . . . .
> A. That sounds right.
> Q. And then Defendant's Exhibit 16, this is dated March 21st, 2019.
> . . . .
> Q. And Mr. Mangan again -- this is from Mr. Mangan. He is talking
> about the plea, and he's trying to do a rough sentencing guideline
> calculation?
> A. Yea. And that was in response call I made to Mr. Mangan
> wanting to know what his feelings were as to where the guidelines
> would fall.
> Q. And then [Defendant's] Exhibit 17?
> . . . .
> Q. And you said, "At this point, it is extremely doubtful that my client
> will accept your plea proposal"?
> A. Correct. I hadn't talked to him about it yet, but I didn't believe he
> would accept it, yes.
> Q. All right. So, in fact, you did not talk to Dr. Sakkal about this plea
> offer until the day of trial, correct?
> A. I don't know for sure. I don't think so. Because it seems to me
> that between March 20th and April 1st, I'm thinking now, without
> having anything in front of me, that I would have talked to him in
> person because we were that close to trial, but I can't be certain.
> . . . .
>    My guess is I would have seen him between March 20th and
> the trial date.
> . . . .

> But the jail records in Butler County would show whether or not, and I can't recall whether or not I would have video-conferenced with him between the 23rd and April 1st, but there would be no record of that.

(Doc. 90 at PageID 1895–97 (20:9-16, 20-22, 24-25–21:5, 9-19, 21-22), (22:1-4)).  At the conclusion of the hearing, the United States offered as an exhibit an "Inmate/Visitor Form" from the Butler County Jail confirming that Mr. Goldberg conducted an in-person meeting with Defendant on March 24.  (*See* Government's Exh. F).

Defendant testified that he first heard of this plea offer on April 1, 2019, the morning of trial, when the Court inquired as to whether any plea offers had been proposed.  Mr. Goldberg "vividly" recalled his discussions with Defendant then:

> Q. You had discussions, and I believe the Court asked if there were any plea offers?
> A. Yes, sir.
> Q. Mr. Mangan recited the plea offer that had been made on the record, some time was taken off the record to discuss the plea offer with Dr. Sakkal?
> A. Yes.
> Q. Did you discuss that with Dr. Sakkal and his family?
> A. Absolutely.
> Q. Who was present?
> A. Okay. I was just going to tell you. Myself, Dr. Sakkal, his daughter-in-law Luna, his wife –
> . . . .
>> So me and the three ladies and Dr. Sakkal all met, and we discussed the plea offer in detail.
> Q. All right. **And did you tell Dr. Sakkal, did you give him a recommendation on taking this plea offer?**
> **A. I told him he should seriously consider taking the plea offer because with the time he had in already and some good time and the fact that he could probably end up in a medical facility and the fact that the last approximate six months could be served here in a halfway house, he wouldn't have a considerable amount of jail time to finish up. And not years and years and years at least, and he's facing a 20-year mandatory minimum.**

**So I said he should very seriously consider the plea offer, and his family even felt the same way.** I remember that meeting very, very vividly because it happened right around the corner of that outer witness room. At the end of – after I said what it was and I started out, I approximated how much time he would have to serve –

**Because this was not an agreed plea. This was a guideline. So there was some room, you know. The numbers would have been between, I think, somewhere between four and five years, somewhere within that vicinity. I felt that I could have argued for maybe a below-guidelines sentence because both sides were going to be free to request a sentence they were hoping for. Notwithstanding the guidelines and because of Dr. Sakkal's age and his failing health, I thought there was a possibility that I could retain a below-guidelines sentence.**

**I explained all this to Dr. Sakkal and his family, and I think they were -- I sensed that they were encouraging him to accept the plea**, and I don't know the words that were used. Some of the discussion was in Arabic between them so I didn't know what they were saying, but I sensed they were encouraging him.

At the end of this conference about the plea, Dr. Sakkal broke down emotionally and was crying. He said he would not take it -- he either said "I won't take it if I have to do another day in jail" or "I won't take it if I have to do up to six more months in jail." I'm not sure which one he said.

At different times during my representation he said, "I'm not taking a plea if I have to do another day" or "If I have to do any more than another six months." I'm not sure which one he said that particular occasion.

Q. **All right. Had you talked with Dr. Sakkal about pleas prior to that date?**

A. **Absolutely.**

**. . . .**

**He didn't want to hear about a plea. Every time I broached the subject, he would cut me off. So it's not like we had a back-and-forth. It was, "No, I'm not pleading unless I come home today or I come home within six months."**

. . . .

Q. And on that day, on April 1st, the first day of the trial, did you tell Dr. Sakkal what he was facing in terms of the sentence if he went to trial?

A. Dr. Sakkal knew long before April 1st what he was facing. It was a 20-year mandatory minimum if he was convicted on one of the death counts. He knew that.

. . . .

Like I said, "This is an offer you should seriously consider
accepting."
. . . .
In his own mind, to this day, he believes he did nothing wrong, and
it's hard to talk to someone that sincerely believes they did nothing
wrong to talk to about pleas. It was literally impossible because he
would cut me off.
. . . .
Q. Did you think that the plea offer was a good offer?
A. Yes.
Q. Did you think he should take it or should have taken it?
A. Well, looking back now, of course. I think it would have -- yeah, I
think he should have taken it.
Q. And did you advise --
A. Even when he backed out, I thought he should have taken it. **I
said, "You should seriously consider it." I never -- it's not for
me to say yes or no. I can suggest and say that "You should
take it. You should seriously consider it," yes.**
**. . . .**
        **His family was listening more than he was. They were
encouraging him.** Like I said, they spoke some in Arabic, and I
didn't know what that was, and he broke down crying. I don't know
why, but he broke down crying and said he didn't want to accept it
unless he was going home then or within six months, and I couldn't
guaranty him that.

(Doc. 90 at PageID 1909–1914 (34:18–35:4, 11-25–37:6, 14-18), (38:6-11, 20-21),

(39:1-4)), 1945–1946 (70:11-20, 22-25–71:2) (emphasis added)).

The *Frye* "duty to communicate formal offers from the prosecution" is not the real

issue here.  To be sure, even though he testified that he couldn't be "certain", the Court

finds it completely implausible that Mr. Goldberg would not have relayed the March 20

plea offer to Defendant when he visited him at the Butler County Jail on March 24.  Mr.

Goldberg has practiced criminal law for 45 years and currently is serving his second

ten-year term on the Cincinnati Bar Association Grievance Committee.  Hence he is well

familiar with his professional obligation to convey plea offers to his clients.  (*See id.* at

PageID 1937–1938 (62:8-25–63:1)).  And he so testified at the March 2 hearing.  ("Even

though I felt he wasn't going to accept it, I have a duty to convey it to him."  (*Id.* at

PageID 1945 (70:6-7)).

But even if not told on March 24, Defendant unquestionably was informed of the

offer immediately before trial *and* was given time to discuss the offer with Mr. Goldberg

and his family.  The real issue, therefore, is whether Defendant has shown with

"reasonable probability" that he would have accepted the plea offer had he been

afforded effective assistance of counsel.

In this regard, Mr. Goldberg credibly testified that he reminded Defendant that he

was facing a "20-year mandatory minimum" and recommended that he "seriously

consider" the offer.  He also pointed out that—with time served, credit for future "good"

time, and the possibility of serving his last six months at a local halfway house—the

remaining time Defendant would spend incarcerated was relatively short.  Mr. Goldberg

also testified that Defendant's family members—speaking in Arabic—seemed to be

similarly encouraging him to consider the offer.

Defendant argues that Mr. Goldberg should have been more effusive in his

recommendation.  But his recommendation cannot be considered in a vacuum:

> Q. But as counselor, as an attorney, part of the job is to give
> advice, to tell the client what you think the best strategy is, what the
> best course of action is, correct?
> A. I thought I made that pretty clear when I said, "You should
> seriously consider accepting this plea."
> Q. Okay.  But when you say "You should seriously consider" as
> opposed to "You should take this plea, I believe this is in your best"
> --
> A. I don't know that there is a big distinction there.  I even talked to
> him about if he got three years or four years and if I got a variance
> down, he would be coming home -- and I sat down with a paper
> and pad, pen and pad, and estimated when he would be coming
> home.  With his time in, his good time, being in a medical facility,

and the last six months or so in a halfway house, he would be back
in Cincinnati in a relatively short period of time.

I mean, just going down and laying that out for him, I thought
that was, you know, my way of saying:  This is a good deal when
you're looking at a minimum of 20 years if you get convicted of one
of the death counts.

**I can't twist someone's arm.  You know, I can't make him
do what he kept saying no to.**

(*Id.* at PageID 1946 (71:3-24) (emphasis added)).  Mr. Goldberg testified throughout

that Defendant would not tolerate any talk of a plea, testimony that Defendant himself

corroborated.  Defendant testified that he rejected a hypothetical plea to three years'

imprisonment that Mr. Goldberg proposed in October/November 2019, wanting "full

exoneration" instead.  With this background, then, Mr. Goldberg asking Defendant to

"seriously consider" the 46-to-57-month offer is more than a sufficient recommendation.

That family members wished to be included in plea discussions further supports Mr.

Goldberg's testimony that Defendant, convinced of his innocence, was resistant to any

compromise unless it resulted in his immediate release from custody.  Listening to his

testimony during the hearing, it is clear to the undersigned that, despite the jury's

verdict, Defendant remains so convinced.

In sum, the Court is satisfied that Mr. Goldberg gave Defendant competent

advice as to whether to accept the plea offer.

At the hearing, Defendant testified that he did not understand the mandatory

minimums that applied to the death specification counts, contributing to his rejection of

the plea offer.  Yet this testimony is at odds with the extensive colloquy in which the

Court and Defendant engaged immediately prior to trial.  In accord with standard

practice, the March 20 plea offer was placed on the record prior to trial.  *See Frye*, 566

U.S. at 145 ("[F]ormal offers can be made part of the record . . . before a trial on the

merits, all to ensure that a defendant has been fully advised before those further

proceedings commence.").  At that time, the Court inquired regarding—and emphasized

to Defendant—the "substantial difference" between the plea offer and potential

sentence in the event of a conviction, particularly on one or more of the death

specification counts:

> MR. MANGAN:  The government did go through and prepare its own estimate as to what the drug quantities and the Sentencing Guideline calculation would be.  Without going through all the various level calculations, the estimate ended up with a final Offense Level of 23.  Assuming a Criminal History Category of I, that would be a range of 46 to 57 months.
> That was the offer.
>
> THE COURT:  Okay.  Let me ask you guys this.  If, in fact, we proceed to trial and there was a conviction of any number of counts but also one of the counts involving the death of a patient, what would the sentencing structure look like at that point?
>
> MR. MANGAN:  If he's facing -- **if he's convicted of one of the deaths, Your Honor, it is a mandatory minimum of 20 years to life, is what he's facing on that.**
>
> THE COURT:  Okay.
>
> MR. MANGAN:  And then, in addition, Your Honor, the drug quantities -- let's say regardless of whether he is convicted of one of the deaths, with respect to the drug quantities we could pursue the related conduct that would go beyond just the ones that are charged in the Indictment.  We could do it as to all of the patients that we deem to be proper.
>
> THE COURT:  Okay.
>
> **So, Doctor, I just want to be clear that you understand what's on the table in terms of the potential settlement of this case.**  The government has indicated what Mr. Mangan just elicited, and the most important thing, although it's just a -- it's not a guess, but it's an estimate that the final sentencing range would be somewhere roughly between 46 and 57 months.
>
> A calculation of a sentencing range is the starting point for my initial determination at the end of the case.  Depending on facts and circumstances, just so you know, I could impose a sentence which is easier or more lenient than that, but I could also impose a sentence which is harsher.  So neither side is bound by what Mr. Mangan has said.  I do have a fair amount of discretion in terms of the sentencing, but ballpark, 46 to 57 months.

Mr. Mangan has also indicated that **if, as a result of a trial, there is a conviction for either one of the cases involving a deceased patient, that we're looking at a mandatory minimum of 20 years**, and then all the drug quantities and all that would be based upon whatever number of counts a conviction was sustained upon.

**So there is a substantial difference between what you are potentially facing in this case and what the government is offering in terms of resolution.**  The difference is significant enough that if you guys need more time to talk about it, I want you to; but if you acknowledge you are aware of that difference and you still wish to proceed, as you've heard, the jury is upstairs and we could bring them down in about 10 or 15 minutes.

(Doc. 65 at PageID 441–443 (4:21–6:23) (emphasis added)).  And the Court confirmed

Defendant's understanding of the maximum possible penalty on the other counts in

which the patients did not die:

THE COURT:  That's okay.  So, Doctor, understanding the conversation we've had, it's absolutely your choice a hundred percent to go forward with the plea offer that's on the table or to go further with a jury trial.

THE DEFENDANT:  The plea is not clear.  The government is not presenting the facts correctly.  I am uninformed enough to take the plea and, thus, I would refuse it.  And I want the record to show the government did not offer a clear offer.  They are offering only one simple, single minimum or maximum option in their mind, but they have not giving me enough information.  And under the information they are giving me, it is unacceptable.  My lawyer and I have talked about it, and we found it unreasonable.

THE COURT:  Okay.  But let me be clear just to cover the last comment you made.  Whether it's reasonable or unreasonable I don't know, but the government does not have a burden to calculate what the potential sentence would be based on speculating which counts of conviction there might be versus which counts of acquittal there might be and whether or not the death specifications are involved or not.

So what they've done is they've done a general assessment of the total Indictment, and **they've also made an offer which is substantially less than what you are facing**.  And I'm going to use the word "facing."  **The offer is substantially less than the potential punishment you are facing if you go to trial.**

That's all I can tell you, and that's -- I can't sit here and go through each count and speculate on whether or not there is going to be a --

THE DEFENDANT:  And I did not ask for a final potential speculation.  I asked for the maximum if the death sentences were dropped, and I asked if the maximum for the other Indictment to be calculated, and that should have been known.  But I understand they are unable to calculate, and I understand that the Court has no numbers to present.

And based on those inadequate fact, I'm un-accepting, I'm refusing this offer which is one-sided and incomplete.  For that reason, it is unreasonable and unfair.

THE COURT:  Okay.  Let me just --
**What is the maximum possible penalty per count?**
MR. MANGAN:  **It's 20 years**, Your Honor.
THE COURT:  **So the maximum possible penalty per count is 20 years, which can be ordered to serve concurrently, at the same time, or consecutively, which means back to back, to back to back, to back to back.  So that is the maximum.**

**So I'm sure Richie has told you what the maximum possible penalties are.  Okay?  So as I understand it, you wish to proceed with the trial; is that correct?**
THE DEFENDANT:  **Definitely.**

(*Id.* at PageID 448–450 (11:22–13:20) (emphasis added)).[12]

The Court appreciates that Defendant—having been convicted and facing a 20-year mandatory minimum—would accept the March 20 plea offer now.  But he has failed to demonstrate with "reasonable probability" that he would have accepted the plea before trial if it had been presented differently.

---

[12] The record makes clear that Defendant previously had been told of the penalties he faced upon conviction.  At the hearing, Mr. Allen represented to the Court that he reviewed the Indictment with Defendant in Florida after he was arrested.  Mr. Allen qualified his representation, though, noting that Defendant, then on suicide watch, was in a compromised mental state.  Fair enough.  The Magistrate Judge advised Defendant of the maximum penalties he faced on all counts in the Indictment during his initial appearance, however.  (Doc. 25 at PageID 115–116).  And Mr. Goldberg consistently testified that he discussed the mandatory minimums with Defendant multiple times.  (Doc. 90 at PageID 1913 (38:6–11); 1936 (61:7-13)).

**IV.     CONCLUSION**

Based on the aforementioned reasons, both Defendant's Motion for Judgment of

Acquittal (Doc. 61) and Defendant's Motion for a New Trial (Doc. 64) are hereby

**DENIED**.

**IT SO ORDERED.**

_/s/ Michael R. Barrett_
Michael R. Barrett, Judge
United States District Court
